1 P.3d 1148 (2000)
141 Wash.2d 68
L. David TYNER III, Petitioner,
v.
The STATE of Washington DEPARTMENT OF SOCIAL AND HEALTH SERVICES, CHILD PROTECTIVE SERVICES, a state government and its division and agency, Respondent,
Indra Drake and John Doe Drake, husband and wife and the marital community composed thereof; Dennis Smith and Jane Doe Smith, husband and wife and the marital community composed thereof; and Susan Hyde and John Doe Hyde, husband and wife and the marital community composed thereof, Defendants.
No. 67602-0.
Supreme Court of Washington, En Banc.
Argued September 16, 1999.
Decided June 15, 2000.
*1150 Poole & Assoc., Jeffrey Gene Poole, Seattle, for Petitioner.
Richard Lawrence Martens, Seattle, for Defendants.
Christine O. Gregoire, Attorney General, Rene David Tomisser, Deputy, Michael E. Tardif, Asst., Olympia, for Respondent.
Bryan P. Harnetiaux, Debra L. Stephens, Spokane, for Amicus Curiae on Behalf of Washington State Trial Lawyers Association.
*1149 MADSEN, J.
This case arises from a Child Protective Services (CPS) investigation into allegations of parental child abuse leveled against Petitioner David Tyner, the father of two minor children. Tyner filed suit against the Department of Social and Health Services (DSHS and State) claiming that a negligent CPS investigation resulted in his four and one-half month separation from his children. The jury awarded Tyner $201,500 in damages. The Court of Appeals overturned the jury verdict, holding that while the State owed a duty to Tyner and was not shielded by immunity, the court's no-contact orders throughout the case cut off any legal causation between the State's negligence and Tyner's separation from his children. We agree with the Court of Appeals' conclusions as to duty and immunity; however, because we find error in the court's analysis of legal causation, we reverse.

FACTS
On January 11, 1993, Debra Tyner, then wife of Petitioner David Tyner, arrived home with the couple's two minor children: T., their four-year-old son, and W., their six-year-old daughter. As Mrs. Tyner pulled into the driveway, she noticed Mr. Tyner's car and commented, "Oh, good, Dad's home already." Def's. Ex. 33. At this point her son allegedly stated "Goody, goody" but then paused and said, "[b]ut sometimes he's mean to me." id. Upon further inquiry, T. complained that sometimes his dad "pulls [his] penis too hard," Id., and poked him in the bottom with his finger. Verbatim Report of Proceedings (RP) (Oct. 16 & 17, 1996) at 71-72.
Mrs. Tyner did not immediately relate this conversation to Mr. Tyner. It was not until later that evening, when Mr. Tyner received an unexpected telephone call from his brother that he became aware of what had transpired. Mrs. Tyner had called Mr. Tyner's mother to ask if there had been any sexual abuse perpetrated against Mr. Tyner during his childhood and his brother had learned of the call and notified Mr. Tyner. After Mr. Tyner received the call from his brother, he confronted his wife and they agreed to call the children upstairs and ask them about the alleged abuse. According to Mr. Tyner, he asked the children "very quietly" if "daddy has ever touched your private parts." RP (Oct. 10, 1996) at 7-8. Both children said "no." Id.
Later that evening, Mr. and Mrs. Tyner visited their former marriage counselor. The next morning, January 12, 1993, with the counselor's support, Mrs. Tyner reported her concerns to the Harborview Sexual Assault Center (SAC). The case was referred to CPS and caseworker Bill Mix was given the assignment.
*1151 That same day Mix interviewed the children at school. Both children denied their father had sexually abused them, told Mix it was not something their mother should discuss, and placed their hands over their ears in protest to the questioning. Mix did not know what to make of the denial, but believed that the children were overly "scared" to talk. RP (Oct. 14, 1996) at 62. He came to the conclusion that at least some of the statements allegedly made to Mrs. Tyner by the children had occurred. Mr. Tyner was telephonically interviewed by Mix the same day and denied any allegations of wrongdoing.
The following day, January 13, 1993, Mrs. Tyner took the children to their family pediatrician, Dr. Hyde, for a physical examination. No physical signs of abuse were discovered, but the results did not rule out abuse either. During the examination, W. did confirm that her brother had made comments to her mother regarding his father "pulling on his penis too hard." RP (Oct. 16 & 17, 1996) at 71. Dr. Hyde then made a recommendation that "because the situation was not clear and there was strong evidence from statements that had been made that there could have been molestation ... the children [should] be with their father only under supervision." RP (Oct. 16 & 17, 1996) at 76.
On January 14, 1993, Mr. Tyner submitted to a polygraph examination. "He was asked whether he sexually touched his children and physiological responses indicated he was not attempting deception in his denial." Clerk's Papers (CP) at 312.
Within the next two days Mrs. Tyner hired an attorney and prepared a petition for protection. On January 15, 1993, Mix was asked by Mrs. Tyner's lawyer to write a declaration in support of the petition and Mix agreed. Mix submitted a declaration dated January 15, 1993, which stated:
The mother reports suspicious symptoms we see in sex abuse cases. Both children have a wetting problem night and day. [T.] sticks his finger in his rectum periodically. The mother said the children have told her that the father puts lotion all over their bodys [sic] and [W.] told her it stung her vagina. The children report that they have secret words and secret games they play with their father.
Pending the completion of my investigation and the police investigation my recommendation to the Court would be:
 That the mother reside in the family dwelling and the father move to another residence.
 That the children have no contact with their father of any kind until recommended by the childrens [sic] therapist. The children and the mother have an appointment to be seen at the sexual assault center.
 The Department will file a dependency petition.
Ex. 2.
The King County Superior Court granted an ex parte temporary order of protection on the same day. The order prohibited all contact between Mr. Tyner and his children.
Throughout the initial investigation, Mr. Tyner repeatedly requested, to the point of furnishing phone numbers, that Mix interview collateral witnesses that would testify they knew of no abuse by Mr. Tyner. Among those suggested were Tyner's former wife who lived locally, his four grown children from his prior marriage, the children's daycare provider, neighbors, a local registered nurse who drove the children to school on a regular basis, and the children's teachers. Neither Mix nor his successor, Toni Sebastian, contacted any of these collateral sources.
On January 26, 1993, Mix filed a dependency petition with the court. Mix testified that the filing of this petition was in part related to the fact that Tyner, acting on the advice of counsel, refused to cooperate in having the children evaluated by SAC. Three days later the court held a shelter care hearing, during which Tyner was represented by counsel. After the hearing, in an order dated January 29, 1993, the court: (1) placed the children in the care of their mother; (2) prohibited all contact between Mr. Tyner and his children; (3) ordered a sexual deviancy examination of Mr. Tyner; and (4) ordered a sexual assault evaluation of the children.
*1152 Mix completed his investigation of the Tyner case on February 2, 1993, and transferred the case to Toni Sebastian, another CPS caseworker. In Mix's final report he checked off on a preprinted form that the allegations against Tyner were "unfounded," as opposed to the other two options, "founded" and "inconclusive." The CPS manual defines "unfounded" as situations in which
there is reasonable cause for the social worker to believe that the allegations on the CPS referral are untrue and that sufficient evidence exists to reasonably conclude that the child has not been abused or neglected.
Ex. 1, at 37; RP (Oct. 14, 1996) at 54.
Neither this report, nor its contents were provided to Mr. Tyner, Mrs. Tyner, their respective attorneys, or the court. On February 10, 1993, Mrs. Tyner filed a petition for dissolution of marriage.
On March 2, 1993, the court held another shelter care hearing. Mr. Tyner was present and represented by counsel. The court continued the placement of the children with Mrs. Tyner, but agreed to visitation when recommended by the father's therapist, the children's therapist, and the State. The court also set a dependency fact-finding hearing for May 3, 1993.
Mr. Tyner's sexual deviancy evaluation was completed one month later. Mr. Compte, the evaluator, reported that there was no reason to suspect Tyner of sexual abuse, to recommend against visitation, or to require supervised visitation.
On April 23, 1993, Harborview completed its evaluation of the children. The evaluator could not say with certainty whether Mr. Tyner had sexually abused his children, but was concerned about the family's poorly defined sexual boundaries and its history of conflicts surrounding sexuality. She recommended the children not be questioned further about the alleged abuse, that contact with Tyner continue to be supervised, and that further therapy focus on family conflicts rather than sexual abuse.
The court then continued the scheduled May 3, 1993 dependency fact-finding hearing until June 28, 1993. This was because the children's evaluator would be out of town and the parents had not completed all of their psychological evaluations. Meanwhile, Mr. Tyner began weekly one-hour supervised visits with the children starting on May 6, 1993. Also, Mr. and Mrs. Tyner agreed to allow Inda Drake to provide therapy for the children and determine whether visitation by Mr. Tyner should be restricted or liberalized. Toni Sebastian, the CPS caseworker who had taken over for Mix in February of 1993, referred Drake.
On June 28, 1993, the court dismissed the dependency petition on the State's motion, finding that both Mr. and Mrs. Tyner had cooperated with court-ordered services and had agreed to a future course of conduct, and that dismissal was in the best interests of the children. Mr. Tyner moved to have the dismissal contain language to the effect that the State had been unable to substantiate its case. The motion was denied. This was the final involvement of the State.
The Tyners' divorce became final in October of 1993. After further litigation regarding a parenting plan, the court granted joint custody to the Tyners and lifted all restrictions on Mr. Tyner's contact with his children.
In February of 1995, Mr. Tyner filed suit against the State and other actors[1] involved in his separation from his children. By the time of trial, the action was reduced to a claim against the State for negligent investigation. The jury found for Mr. Tyner and awarded him $201,500 in damages.
The Court of Appeals overturned the jury verdict, holding that while the State owed a duty to Mr. Tyner and was not shielded by immunity, the court's no-contact orders throughout the case cut off any legal causation between the State's negligence and Mr. Tyner's separation from his children. Tyner v. Department of Soc. & Health Servs., 92 *1153 Wash.App. 504, 963 P.2d 215 (1998). Mr. Tyner petitioned for this court's review, and review was granted. The Washington State Trial Lawyers Association (WSTLA) appears in this case as amicus curiae.

DISCUSSION
The first issue presented by this case is whether the State, acting through its CPS caseworkers, owes a duty of care in conducting an investigation of parental child abuse to the parent suspected of such abuse. The State has argued throughout this case, both at trial and on appeal, that it owes no duty to a parent while investigating allegations of child abuse.[2] Mr. Tyner, however, contends that an implied statutory cause of action in favor of a parent, even one suspected of child abuse, should be derived from RCW 26.44.050.[3]
It is clear that the State has a statutorily mandated duty to investigate child abuse allegations brought to its attention. RCW 26.44.050 provides:
Upon the receipt of a report concerning the possible occurrence of abuse or neglect, it shall be the duty of the law enforcement agency or the department of social and health services to investigate and provide the protective services section with a report in accordance with the provision of chapter 74.13 RCW, and where necessary to refer such report to the court.
The State does not contest that RCW 26.44.050 creates a duty to a child victim when investigating allegations of child abuse. Rather, the State argues that for purposes of tort law its duty does not flow to the child's parents, particularly when the parents are suspected of the abuse.
"`It has long been recognized that a legislative enactment may be the foundation of a right of action.'" Bennett v. Hardy, 113 Wash.2d 912, 919, 784 P.2d 1258 (1990) (quoting McNeal v. Allen, 95 Wash.2d 265, 274, 621 P.2d 1285 (1980) (Brachtenbach, J., dissenting)). In Bennett, we outlined when a cause of action will be implied from a statute. The following questions must be asked:
[F]irst, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation.[[4]]
Bennett, 113 Wash.2d at 920-21, 784 P.2d 1258.
As to the first prong of the Bennett test, the parties disagree as to whether a parent falls within the class for whose "especial" benefit the statute was enacted. The State contends that the statute is solely for the benefit of children, whereas Tyner and *1154 WSTLA assert that the statute contemplates a benefit to the family unit as a whole.
In a case utilizing a test similar to Bennett's, this court announced that "[w]e look to the language of the statute to ascertain whether the plaintiff is a member of the protected class." Schooley v. Pinch's Deli Market, Inc., 134 Wash.2d 468, 475, 951 P.2d 749 (1998). RCW 26.44.050 is nonspecific, in that it fails to do more than announce a general duty of investigation on the part of the State. But RCW 26.44.010, the declaration of purpose section, makes it clear that a parent's interests were contemplated by the Legislature. That provision reads:
The Washington state legislature finds and declares: The bond between a child and his or her parent, custodian, or guardian is of paramount importance, and any intervention into the life of a child is also an intervention into the life of the parent, custodian, or guardian....
RCW 26.44.010.
RCW 13.34.020, a counterpart to Title 26, further evinces the Legislature's strong views regarding the importance of the family, stating that "the family unit is a fundamental resource of American life which should be nurtured." RCW 13.34.020. This same provision also recognizes that "[w]hen the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020.
These statutory provisions are not facially inconsistent. They merely dictate a necessary hierarchy of interests. Those of the children prevail in cases of conflict. However, the Legislature has recognized the importance of the family unit and the inextricable link between a parent and child. During its investigation the State has the duty to act reasonably in relation to all members of the family. The procedural safeguards of RCW 26.44.050 protect both children and family members; children are protected from potential abuse and needless separation from their families and family members are protected from unwarranted separation from their children.
Although not squarely addressed, in Babcock v. State, 116 Wash.2d 596, 809 P.2d 143 (1991) this court implicitly approved a negligent investigation claim by a parent in a similar context. In Babcock, several children were raped by their foster parent. Id. at 598, 809 P.2d 143. The children's paternal grandparents, father, and the children themselves filed a negligent placement suit against the State, alleging that DSHS failed to adequately investigate the backgrounds of the prospective foster parents. Id. at 604, 809 P.2d 143. The specific holding of Babcock dealt with immunity, but the case recognized that the gravamen of the plaintiff's claim was "negligent investigation." Id. at 610, 809 P.2d 143. This Court held that the State did not enjoy immunity for the negligent investigation of its caseworkers and allowed the lawsuit to proceed, including the claims brought by the paternal grandparents and father of the foster children. Id. at 622, 809 P.2d 143.
The State, however, cites State v. Warner, 125 Wash.2d 876, 889 P.2d 479 (1995) for the contrary proposition. In Warner, this court held that a criminal defendant may not claim negligent prosecutorial delay stemming from the failure to promptly report suspected child abuse, as required by RCW 26.44.030, because the reporting requirement was intended to benefit victims of child abuse, not abusers. Warner, 125 Wash.2d at 891, 889 P.2d 479. The State's reliance on Warner is misplaced. First, Warner dealt with a different statutory provision, the duty to report child abuse, not the duty to investigate allegations once they have been reported. Id. Second, Warner did not involve a claim by a parent or family member. Id. at 881, 889 P.2d 479. The interests of a parent are significantly greater than those of a third party in this context. As one court noted, "[c]harges of child abuse leveled against a parent and ineptly handled strike at the core of a parent's basic emotional security, providing ample justification for the imposition of liability." Gray v. State, 624 A.2d 479, 485 (Me.1993). We find the first prong of the Bennett test is met.
The second prong of the test asks this court to determine if legislative intent, explicitly *1155 or implicitly, supports creation of a remedy. In this case, the statute itself is silent as to this point, but this court "can assume that the legislature is aware of the doctrine of implied statutory causes of action...." Bennett, 113 Wash.2d at 919, 784 P.2d 1258 (quoting McNeal, 95 Wash.2d at 274, 621 P.2d 1285). The State does not dispute that the governing statutes imply a cause of action, but argues against extending the duty only to parents and others persons suspected of abuse. RCW 26.44.050 places an affirmative duty of investigation on the State. At the same time, the Legislature has emphasized that the interests of a child and parent are closely linked. RCW 26.44.010. Thus, by recognizing the deep importance of the parent/child relationship, the Legislature intends a remedy for both the parent and the child if that interest is invaded.
An implied tort remedy in favor of a parent is also consistent with the underlying purposes of RCW 26.44.050, thereby satisfying the third prong of the Bennett test. RCW 26.44.050 has two purposes: to protect children and preserve the integrity of the family. The Babcock court noted that "[t]he existence of some tort liability will encourage DSHS to avoid negligent conduct and leave open the possibility that those injured by DSHS's negligence can recover." Babcock, 116 Wash.2d at 622, 809 P.2d 143. "Accountability through tort liability ... may be the only way of assuring a certain standard of performance from governmental entities." Bender v. City of Seattle, 99 Wash.2d 582, 590, 664 P.2d 492 (1983).
The State argues that creating a tort remedy in favor of parents will frustrate the purpose of the statute by forcing CPS caseworkers to compromise the interests of children. As argued by the State:
If this Court now determines that the State can owe to a parent ... a duty not to initiate a dependency while at the same time owing to his child a duty to initiate a dependency, the State will be in an untenable position due to the conflicting responsibilities created by the Court.
Br. of Appellant at 25.
This concern is unwarranted. By implying a cause of action for negligent investigation in favor of a parent, all that is required is that the State act reasonably, not that it act in a flawless manner. There would never arise a situation in which the State owes a duty to both initiate and not initiate a dependency, only a duty to act reasonably in its determination.
Finally, it is worth noting that the Court of Appeals, relying on Babcock, has allowed negligent investigation claims against DSHS based on RCW 26.44.050. See Lesley v. Department of Soc. & Health Servs., 83 Wash. App. 263, 921 P.2d 1066 (1996) (negligent investigation claim brought by parents accused of abusing their child); Yonker v. State, 85 Wash.App. 71, 930 P.2d 958 (1997) (parent's negligent investigation claim for failure to investigate abuse allegation against other parent); Gilliam v. Department of Soc. & Health Servs., 89 Wash.App. 569, 950 P.2d 20 (1998) (negligent investigation claim by father suspected of abuse; scope of duty not an issue on appeal). Both Lesley and Yonker were cited approvingly by this Court in McKinney v. State, 134 Wash.2d 388, 950 P.2d 461 (1998) (implying a statutory cause of action for failure to comply with adoption agency reporting requirements).[5]
We conclude that under RCW 26.44.050, CPS owes a duty of care to a child's parents, even those suspected of abusing their own children, when investigating allegations of child abuse.
Next, the State argues that the court's no-contact orders in this case, separating Mr. Tyner from his children, break the chain of legal causation, thereby defeating Mr. Tyner's negligent investigation claim as a matter of law. There are two elements to proximate causation: cause in fact and *1156 legal causation. Schooley, 134 Wash.2d at 478, 951 P.2d 749. "`Cause in fact' refers to the actual, `but for,' cause of the injury, i.e., `but for' the defendant's actions [would the] plaintiff ... be injured." Id. (quoting in part King v. City of Seattle, 84 Wash.2d 239, 250, 525 P.2d 228 (1974)). This question is normally left to the jury. Id. Legal causation is a much more fluid concept. It is grounded "in policy determinations as to how far the consequences of a defendant's acts should extend." Schooley, 134 Wash.2d at 478, 951 P.2d 749. The focus in legal causation analysis is on "whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." Id. at 478-79, 951 P.2d 749. This inquiry depends upon "`mixed considerations of logic, common sense, justice, policy, and precedent.'" Id. (quoting King, 84 Wash.2d at 250, 525 P.2d 228). As we recognized in Schooley, the concept of legal cause permits the courts to limit liability, for policy reasons, even though duty and forseeability concepts would indicate liability. Id. at 479, 951 P.2d 749.
In this case, the State argues that public policy is not served by imposing liability on the State for "asking a court to determine whether there are adequate grounds to have children examined for possible abuse." State's Answer to Pet. for Review at 17. As the Court of Appeals correctly observed, however, terminating the State's liability at the point that its investigation comes under the supervision of the court "would create an undesirable incentive for the State to convert every investigation into a judicial proceeding." Tyner, 92 Wash.App. at 518, 963 P.2d 215.
Similar to the duty of probation officers to supervise, the duty of CPS workers to investigate exists apart from any action which might be taken by a court. As we observed in Bishop v. Miche, 137 Wash.2d 518, 973 P.2d 465 (1999):
The duty of a county probation officer is not premised merely on the reporting of violations to the court, but rather on the failure to adequately monitor and report violations, thus failure to adequately supervise the probationer.
Id. at 526, 973 P.2d 465. As with negligent supervision, Tyner's complaint centers on conduct outside of the judicial arena. CPS was not enforcing a court order or acting as an arm of the court in its interactions with Tyner. Rather, it was gathering information and conducting an investigation, the results of which ended up in the hands of a judge. As the Court of Appeals noted, a CPS caseworker's duty to investigate is statutorily mandated and must be completed regardless of whether its results may ultimately be presented to a court of law. Thus, the State's liability arises not from its use of the Court to further its investigation but from its failure to adequately investigate the allegations lodged against Tyner.
We agree with the Court of Appeals that the conduct of a CPS caseworker may, in some circumstances, be the legal cause of a parent's separation from a child, even when the separation is imposed by court order. As the court reasoned,
[t]he pivotal consideration is not the involvement of the court per se, but whether the State has placed before the court all the information material to the decision the court must make. Concealment of information or negligent failure to discover material information may subject the State to liability even after adversarial proceedings have begun.
Tyner, 92 Wash.App. at 518, 963 P.2d 215.
This reasoning is in accord with Babcock and Bender. In Babcock, this court held that DSHS caseworkers do not enjoy absolute immunity for their foster care placement investigations. Babcock, 116 Wash.2d at 606, 809 P.2d 143. As this court noted, the Legislature has granted caseworkers only a qualified immunity even in the case of an emergency situation. Id. at 607, 809 P.2d 143. In Babcock, the State's negligence resulted in the foster care placement of children with parties connected with a man who raped them. Id. at 603, 809 P.2d 143. The trial court issued an order confirming that placement. In our decision we said that
a caseworker cannot escape liability for negligent investigation because the juvenile court commissioner relies on the caseworker's *1157 recommendation to allow a caseworker's placement decision to stand. In the absence of a preplacement adversary hearing in which a predisposition study is entered into evidence, the caseworker controls the flow of information to the court.
Id. at 608, 809 P.2d 143.[6]
In Bender, we declined to extend absolute immunity to a police officer in a claim of false arrest against the officer who was acting pursuant to a court-ordered arrest warrant, where the same officer allegedly provided incomplete information to a magistrate in order to originally obtain the warrant. Bender, 99 Wash.2d at 592, 664 P.2d 492. We held that in such situations the officer "is in a position to control the flow of information to the magistrate upon which probable cause determinations are made." Id.
Bishop and Hertog ex rel. S.A.H. v. City of Seattle, 138 Wash.2d 265, 979 P.2d 400 (1999), decided by this court last term, also utilized a materiality standard similar to that articulated by the Court of Appeals in this case. Bishop involved a negligence claim by the parents of a child killed in an automobile accident caused by a King County probationer, Steven Miche, who was intoxicated at the time of the accident. Bishop, 137 Wash.2d at 521, 973 P.2d 465. Suit was filed against the County claiming its probation supervision was negligent. Id. Prior to the accident, the district court refused to revoke Miche's probation despite repeated probation violations. Id. at 523, 973 P.2d 465. This court held that the district court's action precluded the existence of cause in fact as a matter of law, in essence serving as a superseding intervening cause, thereby absolving the County of liability. Id. at 532, 973 P.2d 465. Of principal importance in Bishop was the district court's awareness of all material information in the case at the time of its decision. Id. at 531-32, 973 P.2d 465. As we stated:
The judge knew that Miche had violated the court-imposed condition of his probation by driving while his license was suspended. He knew that Miche had an alcohol problem but attended meetings somewhat sporadically. He knew that Miche was scheduled to attend intensive alcohol treatment within three days, and thus knew that Miche was not then in such treatment and that Miche needed such treatment. Nevertheless, despite Miche's violation of his probation conditions, the obvious severity of his alcohol problem, and the fact that Miche knowingly drove after his license had been suspended, the judge did not revoke probation. The accident occurred only two days later, one day before Miche's scheduled treatment was to begin.
As a matter of law, the judge's decision not to revoke probation under these circumstances broke any causal connection between any negligence and the accident.
Id.
In Hertog, the guardian ad litem for a six-year old girl who was raped by a King County probationer, Barry Krantz, brought a claim against the County alleging negligent supervision. Hertog, 138 Wash.2d at 269, 979 P.2d 400. This court allowed the claim, even though a court had refused to revoke Krantz's probation two months prior to the rape. Id. at 272, 979 P.2d 400. We held that the County probation officer had a continuing duty to supervise Krantz and under the facts of this case the chain of causation was not broken by the judge's decision. Id. at 284, 979 P.2d 400. Hertog and Bishop illustrate that if all material information is presented to the judge, cause in fact will not be found if the complained of action is linked to the judge's decision.
Next, we must examine whether all material information was presented to the court prior to its no-contact orders in this case. In the context of a negligent investigation claim the State's conduct may be the proximate cause of injury where the State has failed to supply sufficient material information. Bishop, 137 Wash.2d at 532, 973 P.2d 465. In such a case, a court order will not break the causal chain.
*1158 Mr. Tyner and WSTLA contend that the Court of Appeals' opinion erroneously invaded the province of the jury when the court concluded as a matter of law that the evidence was insufficient to support a finding that any negligence of the caseworkers was a legal cause of the separation. The Court of Appeals first found sufficient evidence to allow the jury's cause in fact determination to stand, holding that
[b]ut for the CPS investigation and the recommendation by Mix to have [Mr. Tyner] removed from the home, it is possible the courts below would not have issued or extended the orders restricting [Mr. Tyner's] contact with his children.
Tyner, 92 Wash.App. at 515, 963 P.2d 215. Nevertheless, the Court of Appeals then went on to find legal causation lacking as a matter of law because in its view all material information was presented to the court. Id. at 520, 963 P.2d 215.
However, the question of materiality is a question of cause-in-fact, not legal causation. In the circumstances here, the issue of materiality determines whether court intervention serves as a superseding, intervening cause, thereby cutting off cause in fact. It is, accordingly, a question for the jury unless reasonable minds could reach but one conclusion. Hartley v. State, 103 Wash.2d 768, 778, 698 P.2d 77 (1985). C.f. Bender, 99 Wash.2d at 596, 664 P.2d 492 ("[w]hether the additional information ... was `material' to the determination of probable cause is a question for the jury.") Such was the case in Bishop, but not in the case at bar.
In this case, there were two primary items the jury could have determined were material information that should have been supplied to the court. First, caseworker Mix failed to inform the court, as well as any of the parties, that by February 2, 1993, he had reached the determination that the allegations against Tyner were "unfounded." RP (Oct. 14, 1996) at 54. There was expert testimony that this action was a breach of the standard of care. The Court of Appeals' opinion suggests that this was a legal conclusion or opinion, not a representation of fact, and that therefore it was not material to the court's decision. Tyner, 92 Wash.App. at 517-18, 963 P.2d 215. However, the fact that Mix had reached this determination was itself a fact, a fact that might have been relied upon by the court in making its decision. There is little question that courts rely heavily on the judgment of CPS caseworkers in making dependency determinations.[7]
Second, caseworker Mix failed to interview collateral sources, and in turn failed to deliver the information to the court that these sources would have provided. The Court of Appeals held that:
[T]here is no reason to believe the courts would have relaxed the no-contact orders sooner if the caseworkers had informed the court that many people who knew the children did not believe they had been abused and did not believe David Tyner capable of abusing them.
Id. at 519, 963 P.2d 215. This may be true, but the jury was free to reach the opposite conclusion. The jury heard testimony from multiple collateral sources, including Tyner's neighbors, his former wife, and his adult daughter.
The jury was also informed that CPS' own manual requires that key collateral sources be contacted by the CPS investigator.[8] The jury may have reasonably believed that the sources supplied by Tyner to Mix were key collateral sources and had they been contacted *1159 as requested by Tyner, they would have tipped the scales in favor of relaxing the no-contact orders.
We hold that a judge's no-contact order will act as superseding intervening cause, precluding liability of the State for negligent investigation, only if all material information has been presented to the court and reasonable minds could not differ as to this question.
The State argues, however, that a "good faith" standard, as opposed to a negligence standard, ought to measure its duty of reporting information to the court and consequently its duty of investigation. Under this standard, argues the State, it would be liable only if a CPS caseworker "knowingly withholds" or "willfully misrepresents" facts to the court. This is the standard this Court uses to determine whether a police officer may be sued for falsely obtaining a warrant. See Bender, 99 Wash.2d at 592, 664 P.2d 492.
We reject this argument. First, the jury below was instructed under a negligence standard, which was not objected to by the State, and this is now the law of the case. See CP at 110. Second, the State has cited no case, from any jurisdiction, in which this standard has been applied to the conduct of CPS caseworkers. Third, the State did not raise this argument below. Finally, factual differences between CPS caseworkers and police officers obtaining a warrant also militate against such an extension. Police officers are often under immense time pressure when attempting to secure a warrant, relying on information they have no personal knowledge of or time to verify. The Bender rule is very limited and was created with the unique demands of police officers in mind. An extension of this rule into the arena of negligent investigation is unwarranted.
Since in this case reasonable minds could differ as to whether all material information was presented to the court prior to the entering of its no-contact order, we reverse the Court of Appeals, reinstating the jury's verdict.
JOHNSON, ALEXANDER, SANDERS, IRELAND, JJ., and MUNSON, J.P.T., concur.
TALMADGE, J. (dissenting).
The majority finds Child Protective Services (CPS) of the Department of Social and Health Services (DSHS) owed a duty not only to the child victims of alleged physical or sexual abuse but also to a parent accused of such abuse to "properly" investigate the circumstances of the abusive conduct. Despite court decisions removing the child victims from the home of the abusive parent, the majority believes the requirement of proximate cause as to DSHS and CPS is satisfied. The majority's opinion only further confuses the question of the duty owed by the State and its officers when conducting child abuse investigations. The majority opinion also contradicts prior case law on proximate cause in a civil case of this nature. I respectfully dissent.
A. Duty to Alleged Abusers
The starting place for our analysis of the State's potential liability to Tyner is the duty the State owes, if any, to alleged child abusers. The majority cites RCW 26.44.050 and makes passing reference to chapters 13.34 RCW, 26.44 RCW, and 74.13 RCW, Majority at 1153 n.3, when it agrees with the Court of Appeals below that CPS's duty to investigate alleged physical or sexual abuse runs not only to the child victims of such abuse but also to the victims' parents accused of perpetrating the abuse. Our case law concerning the State's liability for failing to properly investigate allegations of child abuse has been hopelessly imprecise; the majority opinion today only exacerbates such imprecision.
The majority fails to carefully review the statutes imposing the duty to investigate allegations of physical or sexual abuse of children on CPS. The purpose of Washington child abuse statutes is to protect the child. This duty arises out of the State's parens patriae right and responsibility to intervene to protect the child, which does not run to the parents because they are adults. In In re Welfare of Sumey, 94 Wash.2d 757, 762-63, *1160 621 P.2d 108 (1980), we specifically noted the constitutional right of parents to raise and nurture their children; however, even that powerfully instinctive and constitutional right must yield to the State's duty to protect our children's well-being. We said:
The parents' constitutional rights, however, do not afford an absolute protection against State interference with the family relationship. Although "[h]istorically, the natural parent's right to custody of a child... [was considered to be] absolute, barring a showing of unfitness ... [g]rowing concern for the welfare of the child and the disappearance of the concept of the child as property has led to a gradual modification in judicial attitude." In re Becker, 87 Wash.2d 470, 477, 553 P.2d 1339 (1976). It is now well established that when parental actions or decisions seriously conflict with the physical or mental health of the child, the State has a parens patriae right and responsibility to intervene to protect the child.
Sumey, 94 Wash.2d at 762, 621 P.2d 108 (alterations in original).[1]
We have found the State may be civilly liable when it breaches a duty created by statute, but we have taken care to predicate that duty upon the statutory obligation created by the Legislature. McKinney v. State, 134 Wash.2d 388, 396, 950 P.2d 461 (1998). A careful review of Washington's statutory protections for children is, therefore, imperative to understanding the scope of the duty, if any, owed by the State and its officers when investigating child abuse.
Protective provisions for Washington's children are found in three separate sections of Washington law. Unfortunately, the majority only quotes brief excerpts from the intent sections of these three critical statutory sequences, which is not enough to convey the precise intent of the Legislature. On closer inspection, the complete intent sections clearly delineate a legislative intent to make the interests of abused or neglected children greater than the interests of their alleged abusers. RCW 13.34.020 states:
The legislature declares that the family unit is a fundamental resource of American life which should be nurtured. Toward the continuance of this principle, the legislature declares that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail. In making reasonable efforts under this chapter, the child's health and safety shall be the paramount concern. The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.
(Emphasis added.) Moreover, RCW 26.44.010 again makes clear that the impetus behind child abuse reporting statutes is to safeguard the general welfare of the children:
The Washington state legislature finds and declares: The bond between a child and his or her parent, custodian, or guardian is of paramount importance, and any intervention into the life of a child is also an intervention into the life of the parent, custodian, or guardian; however, instances of nonaccidental injury, neglect, death, sexual abuse and cruelty to children by their parents, custodians or guardians have occurred, and in the instance where a child is deprived of his or her right to conditions of minimal nurture, health, and safety, the state is justified in emergency intervention based upon verified information; and therefore the Washington state legislature hereby provides for the reporting of such cases to the appropriate public authorities. It is the intent of the legislature that, as a result of such reports, protective *1161 services shall be made available in an effort to prevent further abuses, and to safeguard the general welfare of such children [;] ...
(Emphasis added.) Finally, RCW 74.13.010, which sets forth the obligation of DSHS to create an appropriate child welfare system, makes clear the State's duty runs to the children:

The purpose of this chapter is to safeguard, protect and contribute to the welfare of the children of the state, through a comprehensive and coordinated program of public child welfare services providing for: Social services and facilities for children who require guidance, care, control, protection, treatment or rehabilitation; setting of standards for social services and facilities for children; cooperation with public and voluntary agencies, organizations, and citizen groups in the development and coordination of programs and activities in behalf of children; and promotion of community conditions and resources that help parents to discharge their responsibilities for the care, development and well-being of their children.
(Emphasis added.)
The majority has not reviewed the legislative history of these enactments; yet that history reveals an intent to focus on the welfare of child victims, rejecting the creation of a general duty to parents, which the majority now creates by judicial action. For example, in 1987 the Legislature amended RCW 13.34.020 by removing the phrase "in the absence of compelling evidence to the contrary" and inserting the phrase "unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." Laws of 1987, ch. 524, § 2 (emphasis added). The final bill report for Second Substitute Senate Bill 5659, whose enactment followed the Eli Creekmore tragedy in Snohomish County, made this direction unambiguous:
The intent language of the child abuse chapter is clarified regarding the paramount goal of CPS to protect a child's right to safety. The rights of basic nurture, mental and physical safety of a child must prevail when they conflict with the legal rights of the parents.

(Emphasis added.) The Legislature again amended that statute in 1998, adding the phrase "[i]n making reasonable efforts under this chapter, the child's health and safety shall be the paramount concern." Laws of 1998, ch. 314, § 1 (emphasis added). Both of these amendments clearly indicate the child's health and welfare were of primary concern to the Legislature, not the parents' interest.
Despite its selected references to the statutory intent provisions in chapters 13.34 RCW, 26.44 RCW, and 74.13 RCW, the majority discerns a duty owed by the State to alleged abusers with respect to child abuse investigations. No language in any of these statutory provisions even hints at such a general duty.
More troubling yet is the majority's failure to discuss the specific statutory provisions that afford parents and others suspected of child abuse and neglect due process rights with regard to CPS investigations. Beginning as early as 1985, the Legislature recognized such rights:
The legislature finds parents and children often are not aware of their due process rights when agencies are investigating allegations of child abuse and neglect. The legislature reaffirms that all citizens, including parents, shall be afforded due process, that protection of children remains the priority of the legislature, and that this protection includes protecting the family unit from unnecessary disruption. To facilitate this goal, the legislature wishes to ensure that parents and children be advised in writing and orally, if feasible, of their basic rights and other specific information as set forth in this act, provided that nothing contained in this act shall cause any delay in protective custody action.
Laws of 1985, ch. 183, § 1. RCW 26.44.100 was substantially amended in 1997 to add the following language:
(2) The department shall notify the alleged perpetrator of the allegations of child *1162 abuse and neglect at the earliest possible point in the investigation that will not jeopardize the safety and protection of the child or the investigation process.
Whenever the department completes an investigation of a child abuse or neglect report under chapter 26.44 RCW, the department shall notify the alleged perpetrator of the report and the department's investigative findings. The notice shall also advise the alleged perpetrator that:
(a) A written response to the report may be provided to the department and that such response will be filed in the record following receipt by the department;
(b) Information in the department's record may be considered in subsequent investigations or proceedings related to child protection of child custody;
(c) There is currently information in the department's record that may be considered in determining that the person is disqualified from being licensed to provide child care, employed by a licensed child care agency, or authorized by the department to care for children; and
(d) A person who has demonstrated a good-faith desire to work in a licensed agency may request an informal meeting with the department to have an opportunity to discuss and contest the information currently in the record.
(3) The notification required by this section shall be made by regular mail to the person's last known address.
(4) The duty of notification created by this section is subject to the ability of the department to ascertain the location of the person to be notified. The department shall exercise reasonable, good-faith efforts to ascertain the location of persons entitled to notification under this section.
Laws of 1997, ch. 282, § 2. Moreover, RCW 26.44.100 was again amended in 1988 to expressly afford an alleged abuser the right to seek review of any finding of abuse. The Legislature enacted a new section, RCW 26.44.125, to articulate this right of review:
(1) A person who is named as an alleged perpetrator after October 1, 1998, in a founded report of child abuse or neglect has the right to seek review and amendment of the finding as provided in this section.
(2) Within twenty calendar days after receiving written notice from the department under RCW 26.44.100 that a person is named as an alleged perpetrator in a founded report of child abuse or neglect, he or she may request that the department review the finding. The request must be made in writing. If a request for review is not made as provided in this subsection, the alleged perpetrator may not further challenge the finding and shall have no right to agency review or to an adjudicative hearing or judicial review of the finding.
(3) Upon receipt of a written request for review, the department shall review and, if appropriate, may amend the finding. Management level staff within the children's administration designated by the secretary shall be responsible for the review. The review must be conducted in accordance with procedures the department establishes by rule. Upon completion of the review, the department shall notify the alleged perpetrator in writing of the agency's determination. The notification must be sent by certified mail, return receipt requested, to the person's last known address.
(4) If, following agency review, the report remains founded, the person named as the alleged perpetrator in the report may request an adjudicative hearing to contest the finding. The adjudicative proceeding is governed by chapter 34.05 RCW and this section. The request for an adjudicative proceeding must be filed within thirty calendar days after receiving notice of the agency review determination. If a request for an adjudicative proceeding is not made as provided in this subsection, the alleged perpetrator may not further challenge the finding and shall have no right to agency review or to an adjudicating hearing or judicial review of the finding.
(5) Reviews and hearings conducted under this section are confidential and shall not be open to the public. Information *1163 about reports, reviews, and hearing may be disclosed only in accordance with federal and state laws pertaining to child welfare records and child protective services reports.
(6) The department may adopt rules to implement this section.
Laws of 1998, ch. 314, § 9.
What is readily apparent from this review of the Legislature's enactments is that the Legislature did not create a general duty for the State to alleged abusers with regard to child abuse investigations by DSHS and CPS. The Legislature said expressly that children's rights are paramount. It recognized the need for due process for individuals found to be abusers. But the Legislature did not establish a general duty running from the State to alleged abusers, as the majority incorrectly concludes.
Our case law involving the duty of the State and its officers in child abuse investigations is largely imprecise. We have held a duty to investigate exists; the breach of such a duty can result in civil liability for the State, but not the individual caseworkers. See Babcock v. State, 116 Wash.2d 596, 620-21, 809 P.2d 143 (1991). In Babcock, the duty arose when CPS caseworkers negligently investigated abuse and the children were placed in a foster home where they were sexually abused. Yet we have also specifically held the purpose of Washington's child abuse reporting laws is to protect the children, and those laws create no rights for abusers. As we stated in State v. Warner, 125 Wash.2d 876, 891, 889 P.2d 479 (1995):
Even under the old negligence per se doctrine, a person can only borrow a statutory duty of care to show negligence if the harm that occurs is the type of harm that statute is designed to prevent and the person claiming it is in the class of persons the statute is designed to protect. Herberg v. Swartz, 89 Wash.2d 916, 923, 578 P.2d 17 (1978). That is not the case here. The reporting statute [RCW 26.44.030] is designed to secure prompt protection and/or treatment for the victims of child abuse. The class of persons it is designed to protect is the victims, not the abusers. Thus, Warner cannot use the statute to establish negligence on the part of the State.
(Emphasis added.) The majority's view cannot be reconciled with Warner's.
A number of Court of Appeals cases have also discussed the duty of the State and its officers to properly investigate abuse. In Favors v. Matzke, 53 Wash.App. 789, 770 P.2d 686, review denied, 113 Wash.2d 1033, 784 P.2d 531 (1989), foster parents brought a negligence action against the State claiming CPS caseworkers owed them a duty to explain the consequences of a polygraph test administered in the course of a child abuse investigation. The Court of Appeals noted the statutory duty in a child abuse investigation was owed to the children and declined to find any duty owed by the State to the alleged abusers. In Lesley for Lesley v. Department of Soc. & Health Servs., 83 Wash.App. 263, 921 P.2d 1066 (1996), review denied, 131 Wash.2d 1026, 939 P.2d 216 (1997), however, the Court of Appeals found the State owed a duty based on RCW 26.44.050 to properly investigate child abuse; the court found the duty ran to alleged abusers in a case where CPS caseworkers mistook Mongolian spots, a common African-American birthmark, for bruising. See also Yonker v. Department of Soc. & Health Servs., 85 Wash.App. 71, 930 P.2d 958 (duty owed to alleged abuser where caseworker's allegedly negligent investigation resulted in dependency filing), review denied, 132 Wash.2d 1010, 940 P.2d 655 (1997); Gilliam v. Department of Soc. & Health Servs., 89 Wash.App. 569, 950 P.2d 20, review denied, 135 Wash.2d 1015, 960 P.2d 937 (1998).
Unfortunately, these cases do not carefully analyze the statutory provisions previously enumerated. Moreover, Lesley's reliance on RCW 26.44.050 is misplaced. RCW 26.44.050 merely states:
Upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court. *1164 RCW 74.13.031(3) describes the duties of DSHS as follows:
Investigate complaints of any recent act or failure to act on the part of a parent or caretaker that results in death, serious physical or emotional harm, or sexual abuse or exploitation, or that presents an imminent risk of serious harm, and on the basis of the findings of such investigation, offer child welfare services in relation to the problem to such parents, legal custodians, or persons serving in loco parentis, and/or bring the situation to the attention of an appropriate court, or another community agency: PROVIDED, That an investigation is not required of nonaccidental injuries which are clearly not the result of a lack of care or supervision by the child's parents, legal custodians, or persons serving in loco parentis. If the investigation reveals that a crime against a child may have been committed, the department shall notify the appropriate law enforcement agency.
These statutory provisions offer scant support for the majority's view today or the Court of Appeals' opinions noted above, particularly in light of the appellate court's failure to analyze legislative intent sections in chapters 13.34 RCW, 26.44 RCW, and 74.13 RCW, and the court's failure to discuss RCW 26.44.100.
The area of child abuse investigations is replete with specific statutory directives. Consistent with our holding in McKinney, the duty of the State and its officers should be predicted upon the terms of such statutes. In light of the plain statutory intent of chapters 13.34 RCW, 26.44 RCW, and 74.13 RCW, I would hold the State owes a duty to the victims of alleged physical or sexual abuse to properly investigate such abuse. The State's duty to alleged abusers is narrower and appropriately described in RCW 26.44.100 and .125. The State must advise the alleged abuser of the allegations of abuse and of any official findings. The alleged abuser must be afforded an opportunity to provide correct information and secure administrative and/or judicial review. Implicit in such a duty is the obligation of the State and its officers to act in good faith in conducting an investigation. Moreover, as this specific duty to alleged abusers arose with the 1997 enactment of amendments to RCW 26.44.100 and the enactment of RCW 26.44.125, the duty should apply to conduct occurring after the effective date of the 1997 legislation.
To hold the State and its officers to a general duty to the alleged perpetrators of abuse, as the majority does, creates an extraordinarily difficult conflict for the State and its officers in light of the statutory directives. We ask CPS to be aggressive about dealing with issues of child abuse to protect the children. At the same time, we ask CPS to be sensitive to the interests of the parents, who in some instances may themselves be the perpetrators of the abuse.[2] This dual duty chills and inevitably deters a caseworker from the paramount goal of protecting children from physical abuse and neglect. We cannot reasonably ask the State and CPS to serve two masters. The paramount duty in child abuse investigations is owed to the children who are at risk. If the Legislature feels that a general duty beyond the terms of RCW 26.44.100 and .125 should be owed to alleged abusers, then the Legislature should so provide. It has not done so. We should not create such a duty by judicial fiat.[3]
*1165 B. Proximate Cause
Apart from the question of duty, the majority errs in its treatment of proximate cause. The majority sets forth the factual basis for its opinion but neglects to mention several factors of particular significance with respect to proximate cause. Allegations of physical and sexual abuse by Tyner against his two minor children emerged in early 1993. On January 11, 1993, the 4-year-old son reported to his mother, Tyner's wife, that Tyner sometimes pulled the child's penis too hard and poked his finger in the child's bottom. The Tyners confronted the children that night; both children denied Tyner had touched their private parts. Unbeknownst to Tyner, Mrs. Tyner called his mother to see if he had been sexually abused as a child. The next day, Mrs. Tyner reported her concerns to the Harborview Sexual Assault Center (Harborview). Harborview referred the case to CPS, which assigned the case to caseworker Bill Mix.
On January 12, 1993, Mix interviewed Mrs. Tyner and the children at the children's school. Mix believed the children seemed overly scared of talking with him. Mix interviewed Tyner by phone later that same day. On January 13, 1993, Mrs. Tyner took the children to their family pediatrician, Dr. Hyde, who found no obvious signs of physical abuse. However, Dr. Hyde recommended Tyner have only supervised visitation with the children.
On January 15, 1993, Mrs. Tyner sought an ex parte protective order in the King County Superior Court. Mix provided a written declaration in support of the petition for protection. At the conclusion of the proceeding, the court entered an order prohibiting contact between Tyner and the children. Thereafter, on January 27, 1993, the trial court conducted an adversarial hearing on the original protective order. After hearing from both sides, the trial court ordered the prohibition on contact to remain in effect.
In the meantime, Mix asked Tyner to be evaluated by Harborview, but Tyner refused on the advice of counsel. Tyner provided a list of character witnesses to Mix, but Mix did not interview those character witnesses.[4] On January 26, 1993, CPS filed a dependency petition. On January 29, 1993, pursuant to statute, the court held an adversarial shelter care hearing and subsequently placed the children with Mrs. Tyner, subject to State supervision. The court found the children would be harmed if unsupervised contact with Tyner were permitted. Consequently, it ordered Tyner to complete a sexual deviancy evaluation. The children were to be evaluated at Harborview.
In February 1993, Mrs. Tyner filed a petition for dissolution of marriage. On February 5, 1993, the trial court in the dissolution action issued its own protective order, approved by both attorneys, which continued in force all of the provisions of the January 27 protective order.
On March 2, 1993, a second adversarial shelter care hearing took place. At that time, the court terminated the protective order and Tyner was allowed contact with the children, but only if the State, the children's therapist, and Tyner's therapist agreed. Subsequently, Harborview issued a sexual deviancy report indicating "inconclusive" results regarding sexual or physical abuse of the children. Harborview recommended therapy for the children and the Tyners, and supervised contact between the children and Tyner, in light of what it described as "poorly defined sexual boundaries." Significantly, three adult females came forward during the investigation and alleged Tyner sexually abused them. On June 28, 1993, the dependency petition was dismissed by stipulation of the parties because the Tyners had entered into "voluntary service contracts" with the State. Ex. 19, 20. Pursuant to that dismissal, the children were to continue in therapy and the therapist was to supervise contact between Tyner and the children. Judge Charles Johnson, of the King County Superior Court, refused to find that the charges of sexual and physical abuse lodged against Tyner were "unsubstantial." Ex. 45. The Tyner's divorce became final in October *1166 1993 and Tyner ultimately obtained joint custody of the children.
This history of adversarial proceedings indicates Tyner had repeated opportunities to claim removal of the children was unfounded; however, the courts involved found the circumstances of Tyner's behavior sufficiently questionable to justify continued removal of the children and the continued supervised contact between Tyner and the children.
The majority opinion pays particular attention to Mix's February 2, 1993 report transferring the case to another caseworker. Specifically, the majority notes Mix checked the box on the report indicating the charges against Tyner were "unfounded."[5] However, the majority fails to acknowledge that Mix also checked conflicting boxes on the form indicating the "[r]isk of CA/N [child abuse/neglect] continues; case transferred to ongoing CPS" and that the "Overall Level of Risk" was assessed as "Moderate." Ex. 72. Mix believed Tyner presented a moderate risk of child abuse or neglect and required ongoing supervision. This conclusion does not square entirely with Mix's checking of the "unfounded" box on the report. The report also referenced Tyner's suicidal impulses and the removal of a loaded pistol from the home. Ex. 72. Thus, the factual basis for the majority's implicit belief that CPS and/or Mix somehow misled the courts regarding the investigation of Tyner is not supported by the record here.
The majority reverses the Court of Appeals' determination that the three adversarial proceedings, which led to a series of trial court orders, broke any causal connection between the State's allegedly improper investigation and the children's removal from Tyner's care. Instead, the majority somehow discerns that only Mix controlled the flow of information to the trial court. Therefore, since Mix did not provide all the material information to the courts below, the State was liable for his negligent investigation and that of his associates. This determination defies the facts in this case. Tyner was represented in at least two adversarial proceedings that predated Mix's February 2, 1993 opinion that the charges against Tyner were "unfounded." Moreover, as noted above, this report was far from a "smoking gun." In fact, the report recommended ongoing CPS supervision of Tyner's children in light of his conduct. Finally, Tyner stipulated to dismissal of the dependency proceedings because he entered into voluntary service contracts with CPS.
In Bishop v. Miche, 137 Wash.2d 518, 532, 973 P.2d 465 (1999), we found the court's involvement in decisions regarding not to revoke probation broke the chain of causation for purposes of proximate cause. Likewise, the intervention of multiple courts, in dissolution and dependency proceedings, excluding Tyner from contact with his children, broke the causal chain. The Court of Appeals was correct in this determination. It is difficult to imagine how we can reconcile the majority's holding with the facts of this case or our holding in Bishop.
The majority's construction of the State's duty to investigate is inconsistent with statute and does untold damage to the ability of CPS to properly address child abuse in Washington State. Even if a general duty to child abusers exists, the majority's treatment of proximate cause does not square with Bishop. I would affirm the Court of Appeals' disposition of this case.
GUY, C.J., and SMITH, J., concur.
NOTES
[1] Tyner originally filed suit against: Susan Hyde, the Tyner family physician; Dennis Brown, the family counselor; Inda Drake, the court appointed therapist for the Tyner children; and the State. Dr. Hyde and Mr. Brown were dismissed before trial on the grounds of witness immunity. Ms. Drake was dismissed on grounds of judicial immunity.
[2] The State has not argued that a hierarchy of duties exists under Washington's statutory scheme, whereby the State would owe a duty to a parent unless this would conflict with the State's duty to the child. The State did propose a jury instruction reciting the overriding goal of child protection laws, stating that these "laws are designed to protect the safety and welfare of children who have been or may be victims of child abuse." Clerk's Papers (CP) at 111. This instruction, which was refused, would not have assisted the jury in assessing the potentially conflicting duties between a parent and child. Moreover, the trial court's delivered instruction seems to convey the same message as the State's proposed instruction, stating that "[a] Washington State statute provides that the Department of Social and Health Services and Child Protective Services shall protect children from abuse...." CP at 141. The State does not raise instructional error in its petition to this court.
[3] Three chapters of the Revised Code of Washington set forth the statutory scheme for State intervention as parens patriae when child abuse allegations have been reported: chapter 26.44 (abuse of dependent persons); chapter 13.34 (juvenile courts); and chapter 74.13 (child welfare services).
[4] The Bennett test was borrowed from the federal courts and is similar to § 874A of the Restatement (Second) of Torts, which reads:

When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.
Restatement (Second) of Torts § 874A (1979).
[5] Given the unique nature of every state's legislative scheme in the area of parens patriae, there has been little consistency in other jurisdictions that has addressed issues similar to the one presented by this case. See Gray v. State, 624 A.2d 479 (Me.1993) (finding a duty on the part of the State to a parent suspected of child abuse for negligently handled investigation); Burney v. Kansas Dep't of Soc. & Rehabilitation Servs., 23 Kan.App.2d 394, 931 P.2d 26 (1997) (no duty to nonparent alleged abuser for negligently handled investigation).
[6] The State cites this discussion for its contention that the duty to investigate is negated in an adversarial proceeding. Babcock v. State, 116 Wash.2d 596, 809 P.2d 143 (1991) does not support the State. The court's statement regarding control of information was made in the context of the State's immunity argument not in an analysis of duty.
[7] There was expert testimony given at trial that courts "always follow" the recommendations of social workers in dependency proceedings. Verbatim Report of Proceedings (RP) (Oct. 10, 1996) at 148. This testimony was objected to and the objection was overruled. The jury was free to reach the conclusion that in many cases a social worker's determination will be material to a judge's decision, which was the issue in this case.
[8] Provisions within Child Protective Services' own manual require that collateral sources be contacted. For instance, chapter 26.31 C.11 provides that "[t]he social worker shall interview, in-person or by telephone, professionals and other persons (physician, nurse, school personnel, day care, relatives, etc.) who are reported to have or, the social worker believes may have first-hand knowledge of the incident, the injury, or the family's circumstances." Pl.'s Ex. 1. See also Pl.'s Ex. 1 (Washington State Department of Child Protective Services Manual, chapter 26.22 G, H, I (1992-1993)).
[1] In any circumstance involving the potential dependency of a child, Washington courts have also indicated that in any conflict between the rights of a child and the rights of a parent, the interests of the child must be paramount. In re Welfare of Sego, 82 Wash.2d 736, 738, 513 P.2d 831 (1973); In re Dependency of K.R., 128 Wash.2d 129, 146, 904 P.2d 1132 (1995); In re Dependency of Ramquist, 52 Wash.App. 854, 862, 765 P.2d 30 (1988), review denied, 112 Wash.2d 1006 (1989).
[2] This case presents an excellent example of the difficulty of establishing the contour of the duty owed to a parent. Does a CPS caseworker have a duty to interview every character witness an alleged abuser suggests? Does a CPS caseworker owe a parent a duty to do all in his or her power to exonerate that parent from charges of abuse?
[3] To the extent the majority believes CPS breached any duty in this case by failing to interview Tyner's witnesses, it is wrong. Tyner was able to call witnesses at the numerous shelter care hearings. Report of Proceedings II (Oct. 14, 1996) at 80. In the dissolution-related adversarial proceeding and in one of the dependency-related adversarial proceedings, Tyner and his counsel had the ability to present any evidence they wanted. On two difference occasions, the court believed Tyner had physically or sexually abused his children. Nonetheless, the conditions for Tyner's visitation were adjusted as expert evaluations were received.
[4] However, Tyner himself called several of these collateral witnesses at subsequent shelter care hearings. Report of Proceedings II (Oct. 14, 1996) at 80.
[5] "Unfounded," as indicated on this CPS form, was a term of art. According to the CPS manual, "unfounded" means:

[based on the CPS investigation] there is reasonable cause for the social worker to believe that the allegations on the CPS referral are untrue and that sufficient evidence exists to reasonably conclude that the child has not been abused or neglected.
Ex. 1; Report of Proceedings II (Oct. 14, 1996) at 54.