**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 11, 2022

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 11, 2022

ERIN L. LENNON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| MICHELLE A. DESMET and SANDOR KACSO, individually and as the General Guardians of their daughter, A.K., a minor,<br><br>Respondents,<br><br>v.<br><br>STATE OF WASHINGTON, by and through its agency the DEPARTMENT OF SOCIAL AND HEALTH SERVICES and the CHILD PROTECTIVE SERVICES DIVISION thereof, and YOLANDA A. DURALDE, M.D.,<br><br>Petitioners. | No. 99893-1<br><br>En Banc<br><br>Filed: <u>August 11, 2022</u> |

WHITENER, J.—In February 2016, at approximately three months of age, A.K., the daughter of respondents Michelle Desmet and Sandor Kacso (the parents), was taken into protective custody after she suffered a spiral fracture to her left femur. The parents could not explain how the fracture occurred, and A.K. was placed with her paternal aunt for six months while the Department of Social and Health Services

*Desmet and Kacso v. State*, No. 99893-1

(DSHS)[1] investigated the cause of A.K.'s injury. In August 2016, A.K. was returned to her parents and the dependency action was dismissed.

In August 2018, the parents sued the State and its subdivisions, Child Protective Services (CPS) and DSHS (collectively Department) for negligent investigation, negligent infliction of emotional distress (NIED), and invasion of privacy by false light (false light) based on the Department's allegedly harmful investigation and issuance of a letter indicating that allegations of child abuse/neglect against Desmet were founded (the founded letter). The Department moved for summary judgment, arguing it was immune from suit under RCW 4.24.595(2) because its actions in A.K.'s dependency proceedings were taken pursuant to the juvenile court's order to place A.K. with her aunt. The trial court denied summary judgment and entered a final order finding that no immunity applied. The Department appealed on the immunity issue, and the Court of Appeals affirmed the trial court. The Department claims that the Court of Appeals' decision renders RCW 4.24.595(2) meaningless and that the court erroneously refused to consider the legislative history of RCW 4.24.595(2), which, in the Department's view, was enacted to bar claims like those brought by the parents.

---

[1] Effective July 1, 2018, the newly created Department of Children, Youth, and Families took over child welfare duties that were formerly the responsibility of DSHS. As the events that began this case predated the transition, we use DSHS for consistency with court documents.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Desmet and Kacso v. State*, No. 99893-1

The unambiguous text of RCW 4.24.595(2) does not grant the Department immunity for all actions in an investigation of child abuse/neglect that may coincide with a court order in related dependency proceedings. The statute's grant of immunity is restrictive and only actions taken to comply with a court order are under the statute's limited grant of immunity. Because the Department's investigation and issuance of the founded letter were mandated by statute, not a court order, these actions, which form the basis of the parents' claims for negligent investigation, NIED, and false light, do not fall under the limited liability immunity created by RCW 4.24.595(2). We affirm the Court of Appeals and remand to the trial court for further proceedings.

FACTS AND PROCEDURAL HISTORY

A.     Initial removal of A.K. from her parents' custody

On February 5, 2016, the parents brought their then three-month-old daughter, A.K., to Mary Bridge Children's Hospital because her left leg was swollen and she was unusually fussy. Clerk's Papers (CP) at 237, 242, 350-51. She was diagnosed with a spiral fracture to her left femur. *Id*. at 235-50, 256-80. Dr. Yolanda Duralde, the director of the Mary Bridge Child Abuse Intervention Department, reviewed A.K.'s medical chart and concluded there was "[p]robable inflicted trauma." *Id*. at 283. Dr. Duralde recommended that A.K. "be in a safe environment until investigation can be done." *Id*. The Department and the King County Sheriff's Office

3

interviewed the parents. *Id*. at 350-52, 368-69. The parents denied knowing how the spiral fracture had occurred but mentioned that A.K. had just started attending day care and was there each day from February 1 through 3, 2016. *Id*. at 350-51, 368. Desmet said she stayed home with A.K. on February 4, 2016 because A.K. had started to act abnormally agitated. *Id*. The police took A.K. into protective custody because the parents could not explain how A.K. had been injured. *Id*. at 351. A.K. was placed in the care of her paternal aunt and remained with her for the next six months. *Id*. at 426, 1418.

### B. Dependency proceedings and investigation

On February 9, 2016, the Department filed a dependency petition. *Id*. at 1911-13. At the 72-hour shelter care hearing, the parents did not contest A.K.'s placement with her aunt pending the Department's investigation. *Id*. at 384-92. The court entered a shelter care order continuing A.K.'s placement with her aunt and permitting the parents supervised visitation. *Id*. at 387, 389. The parents visited A.K. every day throughout the six-month placement with her aunt; Kacso visited before and after work, and Desmet quit her job to stay with A.K. from the time A.K. woke up until she went to sleep. *Id*. at 322, 462-64, 1104-05, 1571.

Each parent took a polygraph test as part of the Department's investigation. *Id*. at 354, 1034-35. Kacso passed his first test, showing that he was not attempting deception when he denied causing A.K.'s injury. *Id*. at 114, 1035, 1042. Desmet's

*Desmet and Kacso v. State*, No. 99893-1

first test was inconclusive, indicating that the examiner could neither identify nor rule out truthfulness or deception. *Id*. at 115, 1035. However, Desmet passed her second test, as verified by the polygraph examiner and several independent polygraph experts. *Id*. at 119, 125-26, 137-38, 140.[2] Despite evidence of Desmet's successful test result, case notes from a department social worker showed that a police detective advised the Department that both of Desmet's polygraph tests were inconclusive, which the detective believed showed Desmet was lying. *Id*. at 1288.[3]

On March 31, 2016, the Department issued a founded letter against Desmet, which concluded "it was more likely than not that the abuse and/or neglect occurred and [Desmet was] the person responsible for the abuse and/or neglect." *Id*. at 879-80. The Department maintained that A.K. must have been injured in Desmet's care based on A.K.'s hospital intake, interviews with the parents, A.K.'s medical and day care records, polygraph test results, and Dr. Duralde's opinion[4] that there was

---

[2] The report from the mother's second polygraph test is not in the record. *See id*. at 114-18. However, the private polygraph examiner and several independent experts verified that Desmet's second test showed no evidence of deception when she denied causing A.K.'s injury. *Id*. at 119, 125-26, 137-38, 140.

[3] This opinion was based on a conflicting assessment from the police polygraph examiner, Jason Brunson. *Id*. at 1525. A police report contained the following communication between police and Desmet's attorney regarding this disagreement: "Polygraph Examiner Jason Brunson does not debate his findings on a polygraph. I'm sure if [the initial polygraph examiner] looked again at the charts he could determine for himself how Mr. Brunson found the second polygraph test, taken by Michelle, as inconclusive." *Id*. at 355-56.

[4] On March 15, 2016, Dr. Duralde physically examined A.K. and again concluded her spiral fracture was "highly suspicious for physical abuse" because it would require "some force to break the femur and in this case, a twisting force," and there was "no history of trauma to explain this

5

*Desmet and Kacso v. State*, No. 99893-1

minimal likelihood A.K. was injured at day care. *Id*. at 880. The Department also cited the police detective's assertion that Desmet had two inconclusive polygraph tests and this "[was] indicative of deception and a failed polygraph." *Id*. Desmet did not receive the founded letter until June 14, 2016, after the deadline to appeal had passed.[5] *Id*. at 163, 442-44 (providing 30-day period to request review).

On March 8, 2016, the parents waived the 30-day shelter care hearing and later filed a motion to modify A.K.'s shelter care order based on changed circumstances. *Id*. at 394-96, 398-403. At the motion hearing on April 12, 2016, the parents presented the results of their polygraph tests, several medical professionals' opinions stating A.K.'s injury was consistent with an accident and not physical abuse,[6] psychological evaluations showing that neither parent exhibited a propensity for child abuse/neglect, and declarations from the parents and their family members attesting that A.K. had started to act differently after she returned from day care on February 3, 2016. *Id*. at 3-32, 53-60, 109-26, 137-40, 152-57, 163. The parents also

---

injury." *Id.* at 297-300; *see id.* at 304 (conceding it could have been an accident but "someone would have noted when it occurred" because A.K. would have been "inconsolable" afterward). Dr. Duralde stated she could not determine precisely when the injury occurred or who might have caused it. *Id.*

[5] The Department issued substantively the same founded letter on June 3, 2016, which suggests the original founded letter was not served on Desmet months earlier. *See id*. at 447-50.

[6] One physician specifically noted that A.K.'s leg did not show signs that typically indicate abuse, namely the location of the break and the lack of bruising. *Id*. at 1168-69. He found that the injury may have been caused by a fall where A.K.'s foot was trapped, and her body weight caused the twisting force that resulted in a spiral fracture without bruising. *Id*.

challenged the adequacy of the police investigation, noting only two employees at A.K.'s day care had taken polygraph tests even though there were several other employees who could have handled A.K. during the time frame in which she was injured. *Id*. at 400, 1688. In opposition, the Department presented a declaration from a department social worker who stated the parents were uncooperative when asked to take a polygraph test[7] and "[t]here was deception on the part of the mother." *Id*. at 1880; *see id*. at 1872-76. Several exhibits accompanied the declaration, including Dr. Duralde's report and department case notes documenting its investigation. *Id*. at 1884-87, 1891-1910. The court denied the parents' motion, finding reasonable cause to continue A.K.'s out-of-home shelter care placement because the cause of her injury remained unclear. *Id*. at 1924-25. The initial shelter care order remained in effect, and the parents agreed to undergo further psychological evaluation. *Id*. at 1925.

On August 8, 2016, all parties agreed A.K. should be returned to her parents' care. *Id*. at 425-26. On October 24, 2016, the Department's dependency action was dismissed with prejudice. *Id*. at 198, 432-36. Despite the dismissal, the Department retained the founded letter against Desmet in its files. *Id*. at 166, 1329-39. On

---

[7] This assertion appears to be based on the fact that neither parent was found to be in an acceptable state for a polygraph test the day after A.K. was removed from their care because "they reported no sleep, high emotions, and not feeling suitable for the polygraph." *Id*. at 352. It could also be based on the disagreement between the private polygraph examiner and the police polygraph examiner regarding whether Desmet passed her second test. *See id*. at 355-56.

7

*Desmet and Kacso v. State*, No. 99893-1

February 16, 2017, after several requests from Desmet that the founded letter be replaced with an "unfounded" finding, the Department issued a letter stating that the allegations of child abuse/neglect against Desmet were unfounded. *Id*. at 1304-05, 1331-39, 1341.

### C. Parents' lawsuit against the Department

The parents sued the Department for negligent investigation, NIED, and false light. *Id*. at 158-69. The Department moved for summary judgment, in part, on the grounds that it had complete immunity against these claims under RCW 4.24.595(2). *Id*. at 316, 323-39; *Desmet v. State*, 17 Wn. App. 2d 300, 302, 310, 485 P.3d 356 (2021). The trial judge denied the motion but entered a CR 54(b) order of final judgment on the issue of immunity, which the Department appealed. CP at 1980-82, 1988-89. The Court of Appeals held that the Department was not immune from suit because the parents' "claims relate to the Department's actions after the initial shelter care hearing" and the allegedly tortious conduct underlying the claims was not court ordered; thus, neither RCW 4.24.595(1) nor (2) applied. *Desmet*, 17 Wn. App. 2d at 311-15.[8]

---

[8] The parents also filed suit against Dr. Duralde, but the suit against Dr. Duralde was dismissed by summary judgment in July 2019. CP at 1369-72.

8

*Desmet and Kacso v. State*, No. 99893-1

The Department argues that the Court of Appeals' decision contradicts the purpose of and renders meaningless RCW 4.24.595(2) and that the court erred in refusing to consider the statute's legislative history. Suppl. Br. of Pet'r at 1-3.

ANALYSIS

A.    Standard of review

The sole question before us is whether RCW 4.24.595(2) grants the Department immunity for its postplacement conduct such that the parents cannot pursue their claims of negligent investigation, NIED, and false light at trial. The meaning and scope of RCW 4.24.595(2) is a question of statutory interpretation this court reviews de novo. *Cerrillo v. Esparza*, 158 Wn.2d 194, 199, 142 P.3d 155 (2006).

When interpreting a statute, "[o]ur ultimate objective is to ascertain and carry out the legislature's intent." *Ronald Wastewater Dist. v. Olympic View Water & Sewer Dist.*, 196 Wn.2d 353, 364, 474 P.3d 547 (2020). We start with the plain language of the statute and consider "the ordinary meaning of the language, the statute's context, related provisions, and the statutory scheme as a whole" to discern its meaning. *Id*. If the statutory language is "'clear on its face,'" it is not ambiguous, and our analysis ends. *Cerrillo*, 158 Wn.2d at 201 (quoting *Kilian v. Atkinson*, 147 Wn.2d 16, 20, 50 P.3d 638 (2002) (plurality opinion)). If, however, the statutory language gives rise to more than one reasonable interpretation, it is ambiguous, and

9

*Desmet and Kacso v. State*, No. 99893-1

we may refer to other sources, such as legislative history, to ascertain the legislature's intent. *Id*. at 201-04 (statute not ambiguous simply if there are multiple conceivable interpretations).

### B. Scope of immunity granted by RCW 4.24.595(2)

#### 1. RCW 4.24.595(2) is unambiguous

In 2012, the legislature enacted RCW 4.24.595 to grant governmental entities and their employees liability immunity in two specific instances. LAWS OF 2012, ch. 259, §§ 12-14. First, the statute grants immunity based on conduct "in emergent placement investigations of child abuse or neglect under chapter 26.44 RCW," *except* where such conduct is alleged to constitute gross negligence. RCW 4.24.595(1). Second, the statute makes the Department not liable for complying with court orders and protects department employees from suit based on their participation in the judicial process, providing:

> [t]he department[9] . . . and its employees shall comply with the orders of the court, including shelter care and other dependency orders, and are not liable for acts performed to comply with such court orders. In providing reports and recommendations to the court, employees of the department of children, youth, and families are entitled to the same witness immunity as would be provided to any other witness.

RCW 4.24.595(2).

---

[9] RCW 4.24.595 was amended in 2017 to reflect the merging of DSHS into the Department of Children, Youth, and Families. For simplicity, and because this departmental shift is not relevant to the appeal, we refer only to the current version of the statute.

10

*Desmet and Kacso v. State*, No. 99893-1

The Department argues that the "divergent analyses of the majority and dissent [at the Court of Appeals] illustrate potential ambiguity" in the statutory text above and so this court may refer to legislative history to guide its analysis. Pet. for Review at 11-12; *see Cerrillo*, 158 Wn.2d at 202-04. However, the Department misconstrues the disagreement between the majority and dissent. In holding RCW 4.24.595(2) did not grant the Department immunity, the majority reasoned that although the legislature granted blanket immunity for the Department's conduct (except gross negligence) in emergent placement investigations under RCW 4.24.595(1), it "did not include similar language in RCW 4.24.595(2)" and precluded liability only for acts "*performed to comply with court orders.*" *Desmet*, 17 Wn. App. 2d at 313. The majority determined the parents' claims were based on conduct (i.e., the investigation and issuance of the founded letter) that was not court ordered and, therefore, no liability immunity applied. *Id*. at 313-15. The dissent agreed that the Department was not immune from the "harms arising from false light or negligent investigation." *Id*. at 320 (Glasgow, J., dissenting in part). The dissent disagreed on the parents' ability to recover damages for NIED to the extent the alleged harm arose from A.K.'s continued shelter care placement because that placement was court ordered. *Id*. at 319-20 (Glasgow, J., dissenting in part) ("[T]he legislature left intact a parent's ability to recover for [certain] harms. And the immunity statute does not protect a social worker or other Department employee who fabricates evidence or

11

lies in court."). Thus, the court agreed RCW 4.24.595(2) does not grant the Department blanket immunity from the parents' claims; the only disagreement related to the underlying basis of the parents' NIED claim.[10]

The pertinent language in subsection (2)[11] gives rise to one reasonable meaning. The first clause expressly mandates compliance with court orders, and it is immediately followed by the stipulation that the Department will not be liable for acts taken to comply with those court orders. RCW 4.24.595(2). The term "comply" is commonly understood to mean "[t]o do what is required or requested," as in, to carry out a command. BLACK'S LAW DICTIONARY 357 (11th ed. 2019); *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 465-66 (2002) (defining "comply" as "to complete, accomplish, perform what is due" and "conform or adapt one's actions (as to another's wishes)"); *see also Am. Legion Post No. 32 v. City of*

---

[10] Based on the pleadings, the majority determined the parents' NIED claim was based "on their general allegations that the Department engaged in negligent conduct and possibly on the Department's founded finding." *Desmet*, 17 Wn. App. at 314. The dissent determined the NIED claim was "based solely on the loss of the parent child relationship during the separation." *Id*. at 318 n.5 (Glasgow, J., dissenting in part).

[11] In its response to the amicus brief filed by the Washington State Association for Justice Foundation, the Department renews its argument that it enjoys the protection of witness immunity granted to Department employees under RCW 4.24.595(2). Pet'r's Answer to Amicus Curiae Br. at 19. The Court of Appeals declined to reach this issue because it was raised for the first time on appeal in its reply brief. *Desmet*, 17 Wn. App. at 315-16. Even if the Department's arguments were properly entertained for the first time on appeal, they do not support the Department's claim to immunity from suit for two reasons. First, an individual employee's immunity typically is not imputed to their superior. *Babcock v. State*, 116 Wn.2d 596, 620-21, 809 P.2d 143 (1991) (citing RESTATEMENT (SECOND) OF AGENCY § 217 (AM. L. INST. 1958)). Second, witness immunity protects employees from liability for participating in the judicial process; as discussed in Section B.2, *infra*, the underlying bases for liability in this case are the Department's investigation and issuance of the founded letter, both of which occurred outside the scope of judicial proceedings.

*Desmet and Kacso v. State*, No. 99893-1

*Walla Walla*, 116 Wn.2d 1, 8, 802 P.2d 784 (1991) (court may refer to dictionary definitions to guide interpretation of terms not defined in statute). This limited liability immunity logically applies when the Department is taking action that is necessary (and within its power) to give effect to a court directive, such as transferring a child to a court-ordered placement. It does not preclude a lawsuit against the Department when such suit is based on conduct that is unnecessary to fulfill a court directive, such as acts that merely coincide with a placement decision. The language of RCW 4.24.595(2) is not amenable to another reasonable interpretation. Reference to legislative history, therefore, is improper.[12] *Cerrillo*, 158 Wn.2d at 201.

_____

[12] Even accepting, arguendo, that RCW 4.24.595(2) is ambiguous, legislative history does not reveal an intent to grant the Department immunity from claims of negligent investigation, NIED, or false light. The statute was presented as a resolution to the conundrum created by *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 1 P.3d 1148 (2000), whereby department employees could face individual liability in emergent placement investigations, whether they decided to remove a child or keep them in the home, because the employees had been "charged with an equal duty to both the parent and the child." Hr'g on H.B. 2510 Before the H. Judiciary Comm., 62d Leg., Reg. Sess. (Wash. Jan. 25, 2012), at 1 hr., 2 min., 32 sec. through 1 hr., 5 min. (noting employees "can be sued no matter which decision they make"), 1 hr., 13 min., 5 sec. through 1 hr., 13 min., 33 sec. (emphasizing caseworkers felt equal duty to parents and children "does affect their freedom to act"), *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/house-judiciary-committee-2012011124/?eventID=2012011124. The legislature clearly intended to emphasize that although the Department and its employees owe a duty of care to both parents and children, the Department's primary duty when presented with allegations of child abuse/neglect is to protect the interests of the child; legislative testimony, especially, focused on limiting caseworker liability in emergent placement investigations. *See* S. Floor Debate, 62d Leg., Reg. Sess. (Mar. 7, 2012) at 1 hr., 10 min. through 1 hr., 10 min., 20 sec. (noting statute was intended to "fix" *Tyner* by providing department caseworkers with "a different standard of liability prior to the shelter care hearing") https://www.digitalarchives.wa.gov/Record/View/2C347189DA5A35EF3A7515C4DB9AF6B2. The legislature also granted witness immunity to Department employees to prevent parents from

*Desmet and Kacso v. State*, No. 99893-1

> 2. Liability for negligent investigation

Before the recognition of an implied cause of action for negligent investigation in *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 1 P.3d 1148 (2000), this court analyzed in depth the appropriate distribution of liability in the context of child abuse/neglect investigations and placement decisions in *Babcock v. State*, 116 Wn.2d 596, 606-08, 617-18, 809 P.2d 143 (1991). In that case, department caseworkers placed four minor children with a foster parent who later sexually abused them; the caseworkers were sued because they failed to discover the foster parent's criminal history, "which included charges of forcible rape, sexual assault, and attempted rape," prior to the placement decision. *Id*. at 601, 603. Although the legislature had not yet weighed in on caseworker immunity for placement investigations, the court noted it would be absurd to grant absolute immunity to caseworkers investigating child abuse/neglect, "an immunity traditionally granted judges," when the legislature had granted only qualified immunity to caseworkers making emergency removal decisions prior to an initial shelter care hearing. *Id*. at 606-08. The court explained, "A caseworker cloaked in absolute immunity could deliberately arrange a foster care placement with a known

---

filing lawsuits based on what those employees report and recommend to the court, with the caveat that this protection would not apply to employees who lied or falsified evidence. Hr'g on H.B. 2510, *supra*, at 1 hr., 5 min., 9 sec. through 1 hr., 6 min., 44 sec. As discussed in note 11, *supra*, witness immunity is not applicable in this case.

14

*Desmet and Kacso v. State*, No. 99893-1

rapist in order to facilitate the sexual abuse of a child and escape tort liability. This should not be the law." *Id*. at 606. The court emphasized that caseworker investigations were wholly separate from the judicial process and, analogizing to a decision dealing with police officer immunity in false arrest claims, underscored the great potential for abuse of power given caseworkers' unique "'position to control the flow of information'" to the court. *Id*. at 607, 609-10 (quoting *Bender v. City of Seattle*, 99 Wn.2d 582, 592, 664 P.2d 492 (1983)). Just as police officers should not be immune from liability simply because a facially valid warrant is issued based on their incomplete or biased presentation of facts, *Bender*, 99 Wn.2d at 592, "a caseworker cannot escape liability for negligent investigation because the juvenile court commissioner relies on the caseworker's recommendation to allow a caseworker's placement decision to stand." *Babcock*, 116 Wn.2d at 608. "Like police officers, caseworkers must make decisions which greatly interfere with people's lives. Like police officers, the need for some legal restraints on their power precludes absolute immunity, but the need to make difficult judgments under extremely difficult circumstances justifies qualified immunity." *Id*. at 617-18 (holding caseworkers could be immune for foster placements as long as they

15

*Desmet and Kacso v. State*, No. 99893-1

"(1) carry out a statutory duty, (2) according to procedures dictated by statute and superiors, and (3) act reasonably").

The court declined to extend qualified immunity to the Department, reasoning that it was the Department's "negligent supervision [that] caused [the] injury," at least in part, and that an individual agent's immunity typically is not imputed to their superior, "even when liability is predicated upon respondeat superior." *Id*. at 620-21 (citing RESTATEMENT (SECOND) OF AGENCY § 217 (AM. L. INST. 1958)); *see Savage v. State*, 127 Wn.2d 434, 441-42, 899 P.2d 1270 (1995) (purpose of personal qualified immunity is to protect individual government workers and does not extend to government entity). The court deemed it crucial for the Department to bear "some tort liability" because it would "encourage [the Department] to avoid negligent conduct and leave open the possibility that those injured by [the Department's] negligence can recover." *Babcock*, 116 Wn.2d at 622.[13]

---

[13] Several subsequent decisions have endorsed this balance of denying absolute immunity for governmental entities, like the Department, and granting qualified immunity for individual government workers. "'By encouraging higher standards of care [at the Department level] in the . . . supervision of personnel, such a system can have at least as positive an effect on governmental performance as one based upon liability of the individual official.'" *Savage*, 127 Wn.2d at 447 (quoting George A. Bermann, *Integrating Governmental and Officer Tort Liability*, 77 COLUM. L. REV. 1175 (1977)). This liability distribution "'would also protect the official from any paralyzing threat of direct personal liability.'" *Id*. (quoting Bermann, *supra*, at 1175); *see Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 108, 829 P.2d 746 (1992) ("The threat of agency liability will not necessarily hamper individual decisionmaking as much as the threat of individual liability will."). Further, "[a]ccountability through tort liability in areas outside the narrow exception [of immunity for discretionary governmental decisions] . . . may be the only way of assuring a certain standard of performance from governmental entities." *Bender*, 99 Wn.2d at 590. "The most

16

*Desmet and Kacso v. State*, No. 99893-1

In 2000, this court formally recognized an implied cause of action for negligent investigation of child abuse/neglect under former RCW 26.44.050 (1999).[14] *Tyner*, 141 Wn.2d at 82. *Tyner* established that the Department could face liability for negligent investigation if the court is deprived of material information prior to making a placement decision. *Id*. at 83, 86, 88. The court reaffirmed that department investigations into child abuse/neglect are conducted pursuant to a statutory mandate and wholly "outside of the judicial arena." *Id*. at 83 ("CPS was not enforcing a court order or acting as an arm of the court in its interactions with Tyner. Rather, it was gathering information and conducting an investigation, the results of which ended up in the hands of a judge.").

Three years later, in *M.W. v. Department of Social & Health Services*, 149 Wn.2d 589, 602, 70 P.3d 954 (2003), this court clarified that negligent investigation claims must stem from the type of harm the statute seeks to prevent, namely, "the abuse of children within the home and unnecessary interference with the integrity of the family." Accordingly, the Department may be liable for negligent investigation when it "gather[s] incomplete or biased information that results in a harmful

---

promising way to correct [government] abuses . . . is to provide incentives to the highest officials by imposing liability on the governmental unit. The ranking officials, motivated by threats to their budget, would issue the order . . . necessary to check the abuses in order to avoid having to pay damages." *King v. City of Seattle*, 84 Wn.2d 239, 244, 525 P.2d 228 (1974), *abrogated on other grounds by City of Seattle v. Blume*, 134 Wn.2d 243, 259-60, 947 P.2d 223 (1997).

[14] Former RCW 26.44.050, which was applicable in *Tyner*, does not differ materially from the current version of the statute.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

placement decision, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *Id*. (holding negligent investigation cause of action could not address other claims, including alleged harm caused by Department's examination of child for signs of sexual abuse). Over the next nine years, this court twice engaged in substantive analysis of negligent investigation claims but did not modify the scope of the cause of action beyond that prescribed in *Tyner* and *M.W. See Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 703-04, 222 P.3d 785 (2009) (stepparent lacked standing to bring negligent investigation claim); *Roberson v. Perez*, 156 Wn.2d 33, 46-47, 123 P.3d 844 (2005) (negligent investigation claim inapplicable when parents "voluntarily relinquished guardianship" of their child).

In 2012, the legislature enacted RCW 4.24.595, which grants the Department and its employees immunity in a few specific circumstances. LAWS OF 2012, ch. 259, §§ 12-14. First, the Department and its employees are immune from liability in emergent placement investigations of child abuse or neglect, except when such conduct constitutes gross negligence. RCW 4.24.595(1). Second, the Department and its employees are immune from liability for complying with court orders, such as shelter care placement orders. RCW 4.24.595(2). Department employees, specifically, are also protected by witness immunity when making recommendations and reports to the court. *Id*.

18

*Desmet and Kacso v. State*, No. 99893-1

The Department argues RCW 4.24.595(2) effectively nullified *Tyner*, and so it is entitled to absolute immunity for its postplacement investigation of the alleged child abuse/neglect of A.K. Suppl. Br. of Pet'r at 18. The Department contends that any alternate reading of the statute renders it meaningless because "[t]here are no . . . cognizable causes of action [other than claims of negligent investigation] that would relate to the shelter care or dependency orders specifically referenced in RCW 4.24.595(2)." *Id*. at 19. The Department's position is inconsistent with the plain language of RCW 4.24.595(2), which is not expressly limited to but lists shelter care and dependencies orders as examples of different types of court orders that may act as superseding, intervening causes precluding the Department's liability in some cases. RCW 4.24.595(2) ("The department . . . shall comply with the orders of the court, *including* shelter care and other dependency orders" (emphasis added)); *see Tyner*, 141 Wn.2d at 87, 88 (court order may cut off cause in fact of harm if court has been provided with all material information); *Babcock*, 116 Wn.2d at 609 ("Had the court ordered the actions complained of, quasi-judicial immunity would attach."). It also ignores the fact that RCW 4.24.595(2) could apply in cases where the Department is sued under a common law theory of negligence. *M.W*., 149 Wn.2d at 600 (Department "has an existing common law duty of care not to negligently harm children.").

19

*Desmet and Kacso v. State*, No. 99893-1

The parents argue the Department's negligent investigation and subsequent misrepresentation of "crucial factual allegations and supporting events to the Court to maintain the petition for dependency" resulted in the court's decision to continue A.K.'s out-of-home shelter care placement. CP at 167. The parents point specifically to testimony by the department social worker that Desmet failed two polygraph tests and was deceptive, despite the fact that several independent experts verified Desmet had passed her second test. Answer to Pet. for Review at 11-12. The parents contend the Department knew it had no support for its position because its own expert, Dr. Duralde, "did not attribute [A.K.'s] injury" to the mother. Answer to Pet. for Review at 7; *see* CP at 1680 ("Dr. Duralde did not suggest that the mother caused the injury in her report.").

At the initial summary judgment stage of the proceedings, it is not for this court to decide whether the Department committed actionable negligence. *See Babcock*, 116 Wn.2d at 606 ("The questions concerning whether the caseworkers were negligent have not yet been decided at trial."); *Petcu v. State*, 121 Wn. App. 36, 56, 86 P.3d 1234 (2004) ("claimant must prove that the allegedly faulty investigation was the proximate cause of the harmful placement"). At this point in the proceedings, whether the Department's conduct was the cause in fact of a harmful placement decision is a factual determination that goes to the underlying merits of the parents' claims, not the limited question of law before us. *See Tyner*,

20

*Desmet and Kacso v. State*, No. 99893-1

141 Wn.2d at 87; *see also Hartley v. State*, 103 Wn.2d 768, 778, 698 P.2d 77 (1985)

("such questions of fact are not appropriately determined on summary judgment

unless but one reasonable conclusion is possible"). The sole issue on review is

whether RCW 4.24.595(2) provides the Department immunity from the parents'

negligent investigation claim. It does not.

The plain language of RCW 4.24.595(2) grants the Department liability

immunity for complying with court orders. This court has established that the

Department's investigative function[15] is mandated by statute and is, thus, wholly

separate from court orders and proceedings. *Tyner*, 141 Wn.2d at 83; *see also*

*Babcock*, 116 Wn.2d at 609-10. Should the Department's negligence have caused an

unnecessary and prolonged disruption of the family unit in this case, RCW

4.24.595(2) will not shield it from suit simply because the Department convinced

the court to continue A.K.'s shelter care placement. *See* RCW 13.34.020; *M.W.*, 149

Wn.2d at 602 ("harm addressed by [RCW 26.44.050] is the abuse of children within

the home and unnecessary interference with the integrity of the family"); *see also*

*Babcock*, 116 Wn.2d at 608 ("a caseworker cannot escape liability for negligent

---

[15] It is significant to note that neither police nor prosecutors performing investigative functions enjoy the kind of unqualified immunity the Department seeks. *See Babcock*, 116 Wn.2d at 610, 617-18; *Bender*, 99 Wn.2d at 589-90. To extend absolute immunity for investigations here would contradict decades of our immunity jurisprudence, which emphasizes government accountability by placing liability on those who have the power to prevent future wrongdoing. *See Savage*, 127 Wn.2d at 447; *Lutheran Day Care*, 119 Wn.2d at 108; *Bender*, 99 Wn.2d at 590-92; *King*, 84 Wn.2d at 244.

21

*Desmet and Kacso v. State*, No. 99893-1

investigation because the juvenile court commissioner relies on the caseworker's recommendation to allow a caseworker's placement decision to stand"); *Bender*, 99 Wn.2d at 592 (police officers not immune from liability for false arrest simply because facially valid warrant issues based on incomplete or biased representation of facts). RCW 4.24.595(2) does not preclude the parents' negligent investigation claim. We affirm the Court of Appeals.

### 3. Liability for NIED and false light

The Department argues the parents' claims for NIED and false light "are premised on [their] allegation of a negligent investigation." Suppl. Br. of Pet'r at 22, 24. Although the parents may rely on some of the same evidence to establish all three claims at trial, the causes of action have different elements and are grounded in distinct instances of allegedly tortious conduct.[16] Like the negligent investigation claim, the NIED and false light claims are based on conduct—the issuance of the founded letter—that falls outside the scope of the judicial process; therefore, these claims are not precluded by the limited grant of immunity under RCW 4.24.595(2).[17]

---

[16] The NIED claim requires proof that the Department's negligence caused them and/or A.K. to suffer medically diagnosable emotional distress. *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 506, 325 P.3d 193 (2014). The false light claim requires proof that the Department published statements that put them in a false light that would be considered highly offensive, and the Department "knew of or recklessly disregarded the falsity of the publication and the false light in which [the parents] would be placed." *Eastwood v. Cascade Broad. Co.*, 106 Wn.2d 466, 470-71, 722 P.2d 1295 (1986).

[17] The Department's founded letter was produced pursuant to its statutory obligation under RCW 26.44.020, .030(12)(a)-(b), (13)(a), .050, .100(2).

*Desmet and Kacso v. State*, No. 99893-1

The Department asks this court to hold that the parents' NIED claim is precluded by RCW 4.24.595(2) because, in its assessment, their "claim is based on the continued out-of-home placement ordered by the juvenile court." Suppl. Br. of Pet'r at 23. We decline to do so because of this case's procedural posture. Whether the Department can succeed on this claim to liability immunity depends on a nuanced factual determination regarding whether the juvenile court was denied any material fact before it ordered the continuance of A.K.'s shelter care placement. *See Tyner*, 141 Wn.2d at 83, 86, 88. Should the parents succeed in proving that the juvenile court was denied a material fact (and thus prove negligent investigation), the court's order would no longer function as an intervening, superseding cause that cut off the Department's liability with respect to any of the parents' claims. *See id.* at 87, 88; *Babcock*, 116 Wn.2d at 609. At the summary judgment stage there are insufficient facts to make this determination, and this kind of nuanced fact-finding is properly left to the trial court. *Babcock*, 116 Wn.2d at 606.

CONCLUSION

RCW 4.24.595(2) grants the Department liability immunity for actions taken to comply with court orders. Because the Department's investigation and issuance of the founded letter—both of which form the bases for the parents' negligent investigation, negligent infliction of emotional distress, and invasion of privacy by false light claims—are required by statute, not court order, these functions exceed

23

*Desmet and Kacso v. State*, No. 99893-1

the scope of immunity granted by the statute. Contrary to the Department's position, RCW 4.24.595(2) does not effectively nullify precedent establishing the Department's liability for negligent investigation resulting in a harmful placement decision. Nor does it undo precedent supporting tort liability for the Department to encourage accountability, preventing future misconduct and providing a potential remedy to those harmed by the Department's negligence in child abuse/neglect investigations. For these reasons, we affirm the Court of Appeals and remand to the trial court for further proceedings.

*Desmet and Kacso v. State*, No. 99893-1

_____
Whitener, J.

WE CONCUR.

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____

_____
Yu, J.

_____
Owens, J.

_____
Hazelrigg, J.P.T.

25

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

No. 99893-1

GORDON McCLOUD, J. (dissenting in part)—I agree with the majority that "RCW 4.24.595(2) does not grant the Department [of Social and Health Services (Department)] immunity for *all actions* in an investigation of child abuse/neglect that may coincide with a court order in related dependency proceedings." Majority at 2 (emphasis added). Instead, it grants the Department immunity from suit "for acts performed *to comply with* [*certain*] *court orders*" issued in dependency proceedings. RCW 4.24.595(2) (emphasis added). I therefore also agree with the majority that RCW 4.24.595(2) does not immunize the Department from liability for Michelle Desmet and Sandor Kacso's (the parents) claims for invasion of privacy by false light and negligent investigation.

I disagree, however, with the majority's application of this statute to the parents' claim for negligent infliction of emotional distress (NIED). RCW 4.24.595(2) provides immunity to the Department for actions it takes to comply with a court order. The parents' NIED claim is based squarely on actions that the Department took to comply with a court order: it seeks relief for the harm the

1

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

parents suffered due to lengthy separation from their daughter, A.K., a separation

that continued because the court ordered it.

I therefore dissent in part.

ANALYSIS

RCW 4.24.595 provides the Department with immunity from suit in two

specific instances. First, that statute bars Department liability for its "acts or

omissions in emergent placement investigations," excepting such acts or omissions

constituting gross negligence. RCW 4.24.595(1). Second, that statute bars

Department liability for actions taken "to comply" with court orders. RCW

4.24.595(2).  That portion of the statute states, "The department . . . shall comply

with the orders of the court, including shelter care and other dependency orders,

and [is] not liable for *acts performed to comply with such court orders*." *Id.*

(emphasis added).

The issue here is what constitutes a department "act[] performed to comply

with such court orders."  In this case, the answer is clear.  The parents' NIED claim

rests solely on the harm the parents suffered from the child's placement outside the

home. Clerk's Papers (CP) at 167 ("Defendants jointly and severally negligently

inflicted emotional distress upon Plaintiffs and their minor child from the

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

separation of the family *and the loss of the parent/child relationship during the separation*." (emphasis added)).

That continued placement of the child outside the home was accomplished by *an order of the court* at the shelter care hearing. CP at 387-88, 1924-25. Specifically, that order said, "The child is placed in or shall remain in shelter care, in the temporary custody and under the supervision of DSHS/Supervising Agency, which shall have the authority to place the child in . . . [r]elative placement." CP at 388.[1]

This shows the Department was "act[ing]" to "comply with [a] court order" when it continued A.K.'s placement outside the home. The Department is therefore immune from tort liability for such acts.

---

[1] The parents filed a motion to modify the shelter care order; the court denied the motion and continued A.K.'s placement of A.K. out of the home. Specifically, the court stated:

> The parents' motion for modification of shelter care order and for return home of the child is denied. There is additional information available from experts now, which was not available at the shelter care hearing, and the court does find that this exists as a change in circumstances such that the motion was properly brought before the court. However; based on the current evidence, the cause of [A.K.]'s fracture remains unclear (whether forcible or accidental) and without a plausible explanation for same the court finds the reasonable cause standard for continuing shelter care (out of home placement) continues to be met.

CP at 1925.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

To be sure, the answer to whether the Department is acting "to comply" with a court order or to comply with another duty might not always be this clear. The reason is that some statutes and court orders overlap. For example, RCW 13.34.065(6)(a) requires that the shelter care order "shall include the requirement for a case conference." But RCW 13.34.067(1)(a) statutorily requires the Department to convene a case conference "[f]ollowing [a] shelter care [order]." Whether the Department's duty to convene a case conference stems from a court order or a statutory duty may be unclear.

Similarly, a statute, RCW 13.34.065(2)(a), requires the Department to "submit a recommendation to the court as to the further need for shelter care" at the initial shelter care hearing. A statute then requires the court to make a decision and enter an order: RCW 13.34.065(4)(e) directs the court to inquire whether "the placement proposed by the department [is] the least disruptive and most family-like setting that meets the needs of the child" before entering an order. In this order, the court must decide whether the child should remain out of the home; the court then reviews any out of home placement every 30 days and hears from the Department; the court can enter an order after each review; the court may conduct multiple hearings to determine whether the child should remain a dependent of the state and the court can enter an order after each hearing; and the court must

4

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

ultimately decide, and issue an order memorializing, the permanent plan for child placement and parental rights. RCW 13.34.050, .060, .065, .110, .130, .132, .136, .138. While these statutorily mandated hearings are occurring and the judicial orders are being entered, the Department also investigates the abuse and provides information regarding the care of the child and the capacity of the parents to the court. RCW 13.34.050, .062, .065, .132, .136. In other words, sometimes court orders and statutes impose the same or similar obligations on the Department.

But even if it were unclear whether the Department's allegedly tortious acts were taken to comply with a court order or to comply with a statutory duty, the result would be the same. The reason is that if the immunity statute is ambiguous about its reach, we turn to "aids to construction, including legislative history."[2]

In this case, legislative intent is clear. The legislature enacted RCW 4.24.595 to respond to our decision in *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 1 P.3d 1148 (2000). In *Tyner*, this court held that parents suspected of child abuse can assert an implied cause of action against the

---

[2] *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 12, 43 P.3d 4 (2002). To start, we examine the plain language of the statute and the meaning of that language in the context of the whole statute and related statutes. *Id.* at 11. "[I]f, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." *Id*. at 12.

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

Department for negligent investigation of child abuse allegations. *Id.* at 82. The legislature enacted RCW 4.24.595 in response. The legislative history shows that the legislature sought to limit the Department's liability for a *Tyner* claim of negligent investigation. Hr'g on H.B. 2510 Before the H. Judiciary Comm. (Hr'g on H.B. 2510), 62d Leg., Reg. Sess. (Wash. Jan. 25, 2012), at 1 hr., 4 min., ("this bill . . . would actually restore what the law was prior to the *Tyner* decision"), 57 min., 52 sec. ("[T]he law needs to have clarity about what the primary duty is when a caseworker goes into a home. And the *Tyner* decision that staff mentioned the Supreme Court recognized the rights of the parents and this is really to clarify that the primary duty is to the child."), *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/house-judiciary-committee-2012011124/?eventID=2012011124; S.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2510, at 3, 62d Leg., Reg. Sess. (Wash. 2012) ("The bill is designed to change an anomaly in state law created by the *Tyner* decision.") https://apps.leg.wa.gov/documents/billdocs/2011-12/Pdf/Bill%20Reports/Senate/2510-S.E%20SBR%20HSC%2012.pdf.

In fact, some of the legislative history shows that the legislature was particularly concerned with limiting department liability for exactly what happened here: placing a child out of the home. The bill's primary sponsor sought to prevent

6

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

the possibility that the Department would keep children in unsafe home environments due to fear that improper removal of the child could subject the Department to liability.[3] The legislature therefore emphasized the child's safety and immunized the Department from tort liability for actions taken during emergent placement decisions and for Department compliance with court orders: it specifically immunized the Department from liability for complying with "shelter care and other dependency orders." RCW 4.24.595(2).

So even if RCW 4.24.250(2) were ambiguous about whether it was meant to immunize the Department from liability for acts undertaken to comply with both a court order *and* a statutory or regulatory duty concerning child placement outside the home, the legislative history provides a good aid to interpretation. It shows that the legislature meant the immunity to be broader, not narrower. Again, the Department would be immune from tort liability for acts or omissions done to comply with an obligation imposed by many sources, as long as one of those sources was a court order.

---

[3] Primary sponsor Representative Ruth Kagi testified for the bill, stating, "Under the way the court has interpreted the law, the State can be sued if they remove the child—the State can be sued if they leave the child in the home. And I think we need to make it clear that the duty of that caseworker, the primary duty, is to the child. And then the judge at the shelter care hearing will decide whether that child should be returned home or should remain out of the home." Hr'g on H.B. 2510, at 56 min., 18 sec.

7

*Desmet v. DSHS*, No. 99893-1
(Gordon McCloud, J., dissenting in part)

CONCLUSION

The parents sued the Department for negligent infliction of emotional

distress due to A.K.'s continuing placement outside the home. This continuing

placement occurred because the court ordered it. CP at 387-88, 1924-25. RCW

4.24.595(2) immunizes the Department from tort liability for acts it takes to

comply with such a court order.

I therefore dissent in part.

_____
Gordon McCloud, J.

_____
Madsen, J.